777 P.2d 230

**John H. PETTYPOOL, Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency, Appellee,**

**P.C.I. Medical Inc., Appellee.**

**No. 1 CA UB–88–013.**

Court of Appeals of Arizona, Division 1, Department A.

July 18, 1989.

Community Legal Services by Anne Ronan and Pauline Houle, Phoenix, for appellant.

Robert K. Corbin, Atty. Gen. by Frank Sagarino, Asst. Atty. Gen., Phoenix, for appellee Arizona Dept. of Economic Sec.

OPINION

BROOKS, Judge.

Appellant-employee John H. Pettypool (claimant) appeals from a decision of the Arizona Department of Economic Security Appeals Board finding that he voluntarily quit his employment without good cause, thus disqualifying himself from unemployment benefits pursuant to A.R.S.

§ 23–775(1).[1] The issue on appeal is whether the appeals board's conclusion is erroneous as a matter of law. We conclude that claimant was discharged from his employment and therefore reverse.

## FACTS

At the time of his separation from work, claimant had been employed by P.C.I. Medical, Inc. (employer) for two and a half years. Prior to this time, claimant had owned the business under a different corporate name. However, he sold the company to Robert McClendon and remained with the corporation as an employee with the title of "senior biomedical technician." McClendon, president of the corporation, was claimant's only supervisor.

Employer is engaged in the business of medical equipment maintenance and repair. Most of the repairs are done on the corporate premises, except that field service is provided for two medical institutions. The company employed approximately seven persons during the period of claimant's employment, but claimant was the only employee earning a salary; all others were paid by the hour. Claimant was paid $1200 every two weeks, regardless of whether he worked more or less than 40 hours a week.

In early May, 1987, McClendon called a meeting of the employees. He stated that he wanted everyone to work from 8:00 a.m. to 5:00 p.m. Prior to this, according to claimant's testimony, he had worked his own hours—averaging 50 hours per week. McClendon contended that claimant worked an average of only 30 hours a week. However, there was evidence that, in addition to claimant's work in the shop and in the field, he occasionally worked at home, a fact of which McClendon was unaware. In any event, claimant told McClendon that he would need a little time to adjust to the 8 to 5 schedule, since he had been working his own hours for two and a half years.

All parties agree that the week of June 1st through 5th, 1987, claimant worked only 32 hours. Claimant stated that he asked for and received permission to work less than 40 hours, but McClendon denied this.

On Monday morning, June 8th, McClendon called claimant into his office. He handed claimant a document entitled "Disciplinary Action Record" (DAR) and asked him to read it. The document stated that claimant had been informed that he was to work 40 hours a week and that he was to maintain a reasonable level of productivity and a good attitude. It then documented claimant's hours worked for the previous week, which totalled 32. It also stated that claimant's attitude had been poor and his productivity low. It then read:

ACTION: John [claimant] is being changed from a salaried employee to an hourly employee effective 6/1/87. He will be paid only for hours worked based on his bi-weekly salary divided by 80 hours [$1200 divided by 80 hours equals $15 an hour]. John is being placed on probation to last an indefinite period of time. John will be expected to work from 8 to 5, Monday thru Friday, with a good attitude and productive actions. John will not be expected to take any after hours call and will turn in his pager immediately. Effective 6/8/87, John will report to the PCI Biomedical shop manager Mr. Jeffrey Croner. Mr. Croner will supervise John and monitor his activities and attitude.

ANY display of bad attitude, low productivity, and/or poor attendance will result in termination.

The effect of this on claimant's wage was that he would receive $480 (32 hours times $15) instead of his normal salary of $600 for the *previous* week. Finally, the DAR stated that "[f]ailure to sign this acknowledgment will be interpreted ... as [claimant's] resignation."

1. A.R.S. § 23–775(1) provides in part:
   An individual shall be disqualified for benefits:
   1. For the week in which he has left work voluntarily without good cause in connection with the employment, and in addition to the waiting week, for the duration of his unemployment and until he has earned wages in an amount equivalent to five times his weekly benefit amount otherwise payable.

Claimant replied that he could not sign the document and that he thought it was unfair. He did not attempt to discuss the change in wage status. He then left work and never returned.

Claimant filed for unemployment benefits with the Arizona Department of Economic Security (ADES) claiming that he was forced to quit. However, the ADES deputy investigator issued a determination denying benefits because he found that claimant voluntarily left work without good cause. The ADES Appeal Tribunal then conducted a hearing at claimant's request and affirmed the deputy's conclusion. The tribunal found that although claimant was denied wages that he had earned as a salaried employee, he was not entitled to benefits because he quit and did not attempt to adjust the grievance with the employer pursuant to Arizona Administrative Code (A.A.C.) R6–3–50500(C)(1).[2] The ADES Appeals Board affirmed the tribunal in a summary fashion, adopting the tribunal's "findings of fact, reasoning, and conclusion of law" as its own. Upon review, the board addressed each of claimant's arguments and again affirmed. It found that claimant voluntarily quit, that there was no retroactive wage reduction, and that claimant failed to attempt to adjust his grievance with the employer. It is from this decision that claimant now appeals.

### DISCUSSION

In reviewing administrative decisions, this court is bound by the appeals board's findings of fact unless they are arbitrary, capricious, or an abuse of discretion. *Thompson v. Arizona Dept. of Economic Sec.*, 127 Ariz. 293, 619 P.2d 1070 (App. 1980). Legal conclusions of the board, however, are not binding on this court and we are free to draw our own legal conclusions in determining if the appeals board properly interpreted the law. *Prebula v. Arizona Dept. of Economic Sec.*, 138 Ariz. 26, 672 P.2d 978 (App.1983).

**2.** A.A.C. R6–3–50500(C)(1) provides:

A claimant would have good cause for quitting if the facts clearly establish that his employer willfully refused to pay him wages that

In this case, although some facts are disputed, those facts which are dispositive of the issues are not disputed. These undisputed facts include the DAR itself and the fact that, prior to June 8th, 1987, claimant was a salaried employee who was to be paid a set wage amount no matter how many hours he worked.

### 1. Wage Reduction

█ We first consider whether a retroactive change in claimant's status from a salaried employee to an hourly employee deprived him of wages that he had already earned. The appeals board set out the ultimatum presented to claimant by the employer as follows: "[A]ccept a *change in working conditions* or resign." (Emphasis added.) The board's analysis was incomplete. The DAR did not merely set out a change in working conditions. Although some of the changes made by the employer might well have been legitimate exercises of the employer's authority, the wage status change was retroactive. Although it was disputed by the parties whether or not claimant had permission to work less than 40 hours the week prior to his separation from work, his right to receive his full salary was not in dispute. By McClendon's own testimony, claimant was entitled to $600 per week whether he worked more or less than 40 hours.

Q. If the claimant worked more than 80 hours in [a] two-week period, was he paid more than the normal amount of money?

A. [McCLENDON] The claimant never worked more than 80 hours during that period of time.

Q. If he had, would he have been paid more than that?

A. He, he would not have. He was considered a salaried employee.

Q. *If he worked less than 80 hours during that period would he have been paid less than his bi-weekly salary?*

A. *He would not have.*

were actually due, provided that he first made a reasonable attempt to adjust his grievance. *See also* A.A.C. R6–3–50210(C) (good cause for voluntarily quitting requires an attempt to adjust the grievance).

(Emphasis added.) Thus, McClendon retroactively changed claimant's wage status, denying him previously earned wages. The board abused its discretion in finding that there was no retroactive wage reduction.

### 2. Voluntariness

■ We next consider whether the demand that claimant accept a retroactive wage reduction was unreasonable and whether, because it left him no choice but to resign, it was, in effect, a discharge. Arizona Revised Statutes § 23–775(1) provides that an individual will be disqualified from receiving unemployment benefits if he or she "has left work voluntarily without good cause...." The phrase "left work voluntarily" means the termination of the employer-employee relationship by means of the employee's own intention. This is to be distinguished from quitting involuntarily which may be brought about by the employer's intention or factors beyond the control of the employee. A.A.C. R6–3–5005(A). Thus, quitting involuntarily would have the same effect as a discharge.

ADES has enacted rules and regulations to use in determining whether an employee has been discharged or has voluntarily quit. Arizona Administrative Code R6–3–50135(A)(1) proclaims that a separation from work is either a quit or a discharge. Part (3) of that section states: "The separation is a discharge when it results from the employer's intent and action. This includes layoff for lack of work, and requests by the employer for [a] worker's resignation." Furthermore, A.A.C. R6–3–50190(B)(2)(c) provides that "[w]hen a claimant states that he did not leave voluntarily, and the employer maintains that he did, the burden of proof shifts to the employer to establish that there has been a quit." Claimant here argues that he did not quit voluntarily, but was, in effect, asked to resign. Thus, in this case, the employer had the burden to show that claimant voluntarily quit.

Claimaint argues that the employer presented him with a Hobson's choice. He could either sign the DAR or not sign it. If he did, he would forfeit a portion of wages that he had already earned. If he did not sign the DAR, he would be deemed to have resigned. Since signing the DAR was a patently unreasonable alternative, claimant argues that the employer forced him to resign. Thus, claimant concludes that the DAR was effectively a request for resignation. We agree.

In support of his argument, claimant cites *Green v. Board of Review of Indus. Comm'n*, 728 P.2d 996 (Utah 1986). In that case, the Supreme Court of Utah interpreted a statute similar to Arizona's, which excluded from benefits those employees who "left work voluntarily." *Id.* at 997. The employee in *Green* was a bus driver who had exceeded the number of preventable accidents the employer allowed, and was therefore subject to dismissal. Rather than dismiss him, however, the employer gave the employee the option of termination or signing a "behavorial commitment" not to have "any more accidents." *Id.* The employee took this to mean that "any more accidents" included accidents over which he had no control, and the employer never explained that it meant anything else. Therefore, the employee felt that he could not, in good conscience, make such a promise. He was then fired.

The employer argued that the employee was given a choice to sign the behavioral commitment or be terminated, and since he did not sign the commitment he freely chose to leave work. However, the Utah court did not agree. The court stated that the determinative factor in deciding voluntariness, quite obviously, is the volition of the employee. "Even though the employee is given a 'choice,' if that choice is not freely made, but is compelled by the employer, that is not an exercise of volition that would disqualify the employee from benefits." *Id.* at 998. Thus, the court concluded that the employee's termination was not volitional.

We agree with the rationale of *Green*. Further, we recognize that implicit in the decision, though not explicitly stated, is the assumption that, in order to render the employee's termination involuntary, the choice given by the employer must be un-

reasonable. That is, the alternative to termination must be an unreasonable request.

The appeals board's discussion of *Green* is perplexing. It focuses solely on the factual distinctions between *Green* and the case at hand without addressing the common legal issue. Although the factual distinctions are valid, the rule in *Green* nevertheless applies here.

The focus in cases such as the one at issue is voluntariness. The mere fact that an employee quits or resigns is not dispositive. It must be determined whether or not he did so voluntarily. An involuntary quitting, or forced resignation, is equal to a discharge. *See* A.A.C. R6–3–50495 and R6–3–5005(A). If this were not so, employers could choose to force employees to resign rather than discharge them, thereby avoiding liability for unemployment benefits. Thus, the critical factor in every separation from work is the volition of the employee.

Applying this principle to the case before us, we find that claimant did not leave work voluntarily. He was presented with an illusory "choice." He could either accept the nonpayment of wages to which he was entitled as a salaried employee, or be deemed to have resigned. The nonpayment of wages actually earned is patently unreasonable. Thus, claimant had no choice but to resign, and employer, in effect, discharged him.

Although not cited by any of the parties, *Valley Vendors, Inc. v. Jamieson,* 129 Ariz. 238, 630 P.2d 61 (App.1981), supports our holding. In that case, the employee was told either to take a polygraph test or "punch out" until he did. *Id.* at 240, 630 P.2d at 63. The employee refused to take the test and left work. This court, without analysis, upheld the conclusion of the tribunal that the employee was discharged rather than voluntarily quit.

### 3. Attempt to Adjust Grievance

Finally, the employer asserts that this court is bound by the board's finding that claimant did not attempt to adjust his grievance. If this were a case in which the employee voluntarily quit, we would agree.

However, we need not address that particular finding of the board. We have already found that claimant was discharged; he did not leave work voluntarily. One who is fired need not attempt to adjust the grievance in order to receive unemployment benefits.

For the foregoing reasons, we reverse the decision of the appeals board and remand this matter to the board for proceedings consistent with this opinion.